Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| BANCO POPULAR DE PUERTO RICO<br><br>Demandante - Apelado<br><br>v.<br><br>DAVID EFRÓN, NORFE GROUP CORPORATION<br><br>Demandados - Apelantes | KLAN202500479 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso núm.: SJ2024CV04141<br><br>Sobre: Cobro de dinero – Ordinario, Ejecución de Hipoteca: Propiedad Residencial |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de junio de 2025.

El Tribunal de Primera Instancia ("TPI") declaró con lugar, por la vía sumaria, una demanda de cobro de dinero y ejecución de hipoteca. Según se explica en detalle a continuación, el TPI actuó correctamente porque el Banco demostró, de forma incontrovertida, que la deuda era válida y exigible y que, contrario a lo planteado por los peticionarios, no estaba pendiente solicitud alguna de mitigación de pérdidas.

I.

En mayo de 2024, el Banco Popular de Puerto Rico (el "Banco") presentó la acción de referencia (la "Demanda") contra el Sr. David Efrón (el "Deudor") y Norfe Group Corporation (la "Corporación"), (ambos, los "Demandados"). El Banco alegó que era tenedor de buena fe, por endoso, de un pagaré garantizado mediante hipoteca a favor de Popular Mortgage, Inc., suscrito por el Deudor, y que este incumplió con sus obligaciones de pago en relación con el pagaré aludido. La hipoteca grava un apartamento en el Condominio Casa Magna, sito en Guaynabo (la "Propiedad"), el cual consta inscrito a

nombre de la Corporación. El Banco sostuvo que, desde el 1 de enero de 2016, el Deudor dejó de pagar las mensualidades vencidas y, al momento de presentarse la Demanda, la deuda ascendía a $1,042,623.20 de principal; intereses a razón de 6.125% anual, a partir del 1 de diciembre de 2015; más $114,750.00 por concepto de costas, gastos y honorarios de abogado.

Luego de algunos trámites procesales, el 24 de julio, el Deudor instó una *Moción de Desestimación* (la "Moción de Desestimación"). En síntesis, sostuvo que el Banco incumplió con la *Real Estate Settlement Procedures Act* (RESPA) y el *Fair Debt Collection Practice Act* (FDCPA), tanto en el proceso de *loss mitigation* como en una carta pre-demanda cursada por el Banco el 25 de marzo de 2024. Explicó que, en un pleito anterior instado por el Banco, este reconoció que el Deudor había completado y presentado una solicitud de *loss mitigation.* Adujo que dicha solicitud todavía estaba pendiente de evaluación, razón por la cual, bajo las leyes federales antes aludidas, el Banco estaba impedido de presentar la Demanda.

El Banco se opuso a la Moción de Desestimación. Planteó que no hay requisito en ley que exija que una carta extrajudicial contenga el historial del proceso de *loss mitigation,* más aún cuando, en marzo de 2020, el Banco le aprobó un período de prueba al Deudor como primer paso para una modificación, y este prefirió acogerse a la moratoria especial de cuatro (4) meses disponible a raíz de la pandemia por el COVID-19. Destacó que el Deudor nunca volvió a presentar una solicitud completa de *loss mitigation.* El Banco puntualizó que el Artículo 3 de la Ley Núm. 169-2016,[1] 32 LPRA sec. 2893, que impide a un deudor hipotecario iniciar un procedimiento de ejecución de hipoteca cuando recibe una solicitud

---

[1] Cónsono con lo establecido en la Real Estate Settlement Procedures Act, 12 U.S.C. 2601 *et seq.,* (RESPA), la Asamblea Legislativa adoptó el programa de Mitigación de Pérdidas "Loss Mitigation", mediante la Ley Núm. 169 de 9 de agosto de 2016, denominada como Ley de Ayuda al Deudor Hipotecario, 32 LPRA sec. 2891 *et seq.,* (en adelante Ley Núm. 169-2016).

completa para el programa de *loss mitigation*, aplica exclusivamente a propiedades que sean residencia principal. En el caso de autos, la propiedad inmueble está a nombre de la Corporación.

Asimismo, con la referida oposición, el Banco acompañó copia de varias cartas enviadas a los Demandados en diciembre de 2022, noviembre de 2023 y marzo de 2024, en las cuales les advirtió que, aunque el préstamo hipotecario había sido referido para el cobro por la vía judicial, tenían la opción de solicitar una evaluación al Departamento de Mitigación de Pérdidas del Banco para verificar si podían beneficiarse de diversas alternativas disponibles que podrían "permitirle conservar la propiedad". De otra parte, el Banco alegó que la ley federal pertinente no exige que se desglosen los intereses, recargos, costas y honorarios de abogado.

Las partes presentaron mociones de réplica y dúplica en apoyo a sus respectivos argumentos. El Deudor reiteró que el Banco nunca emitió una "disposición final" en cuanto a su solicitud de *loss mitigation* del año 2020, por lo cual no estaba obligado a presentar una nueva solicitud.

Por su parte, el Banco sostuvo que los escritos del Deudor no estaban respaldados por documentos o declaraciones juradas. Añadió que, según sus récords, copia de los cuales anejó, intentó infructuosamente comunicarse por la vía telefónica con el Deudor en más de cincuenta (50) ocasiones. Por lo tanto, el Banco sostuvo que se le notificó al Deudor sobre la alternativa de retomar el proceso de *loss mitigation*, pero fue el propio Deudor quien prefirió no acogerse a dicho proceso.

Mediante una *Resolución* notificada el 27 de agosto, el TPI denegó la Moción de Desestimación.

En desacuerdo, el Deudor interpuso un recurso de *certiorari* ante este Tribunal (KLCE202401117) y, el 28 de octubre, dictamos una *Resolución* mediante la cual declinamos intervenir con la

determinación recurrida, debido a que la Demanda contiene una causa de acción viable. Concluimos que, contrario a lo alegado por el Deudor, "consta ante el TPI una carta de abril de 2020, dirigida al Deudor, en la cual se le informó que su solicitud [de *loss mitigation*] se consideraba como incompleta." Resaltamos que el TPI tenía ante sí "varias comunicaciones escritas posteriores, dirigidas al Deudor, en las cuales el Banco le invitaba a presentar una solicitud de mitigación de pérdidas …".

Aún en desacuerdo, el Deudor incoó un recurso de *certiorari* ante el Tribunal Supremo de Puerto Rico (CC-24-0755), pero dicho foro denegó la solicitud mediante una *Resolución* de 24 de enero de 2025.

Continuados los procedimientos ante el TPI, el 24 de febrero de 2025, el Banco interpuso una *Moción Solicitando Sentencia Sumaria* (la "Moción del Banco"). En síntesis, expuso que no existía una controversia fáctica que le impidiese al TPI dictar sentencia por la vía sumaria y concluir que procedía ordenarle al Deudor el pago de lo adeudado, más costas, gastos y honorarios de abogado.

El 21 de marzo, la Corporación se opuso a la Moción del Banco, a la cual luego se unió el Deudor. El Deudor afirmó que había presentado una solicitud completa para ser evaluada por el departamento de *loss mitigation*. Reiteró que el Banco incumplió con el procedimiento de *loss mitigation* y que dicho incumplimiento afectó su oportunidad de beneficiarse de dicho trámite. Añadió que dicho incumplimiento también privaba al TPI de jurisdicción para conceder el remedio solicitado.

El 1 de abril, el Banco instó una *Réplica a Oposición a Moción de Sentencia Sumaria*. Detalló las cartas cursadas al Deudor en la que se demuestra que notificó a los Demandados de su determinación en torno a la solicitud de *loss mitigation* y que fue el

propio Deudor quien prefirió no acogerse a dicho proceso y quien insistió en no actualizar su solicitud.

Por su parte, el 21 de abril, los Demandados incoaron una *Dúplica Conjunta a Réplica, en Relación a Oposición a Moción de Sentencia Sumaria y Moción Conjunta al Expediente Judicial.* Básicamente, arguyeron que el Banco no demostró haberles informado oportunamente en cuanto al cierre de la solicitud de *loss mitigation*; su derecho a presentar una apelación; y la posibilidad de presentar una solicitud actualizada.

El 15 de mayo, el TPI notificó una *Sentencia* en la cual declaró *Ha Lugar* la Demanda, condenó al Deudor al pago de la suma reclamada en la Demanda y dispuso que, de no efectuarse el pago, la Propiedad podría ser vendida en pública subasta (la "Sentencia"). Formuló las siguientes determinaciones de hechos:

1. La parte demandante es tenedora de buena fe por endoso de un pagaré hipotecario suscrito por la parte demandada a favor de Popular Mortgage, Inc., o a su orden, el día 9 de julio de 2009, mediante afidávit número 14,528 ante el notario público Sergio A. Ramírez de Arellano, por la suma principal de $1,147,500.00, más intereses al 6.125% anual y otros créditos accesorios.

2. Para garantizar el pagaré antes relacionado, sus intereses al tipo pactado, de los créditos accesorios y de una suma de $114,750.00 pactados para honorarios de abogado en caso de reclamación judicial, la parte demandada constituyó una primera hipoteca, según surge de la escritura número 182 otorgada en San Juan, Puerto Rico, en igual fecha y ante igual notario, sobre la propiedad que se describe a continuación:

PROPIEDAD HORIZONTAL: Condominio Casa Magna de Guaynabo. Apartamento: 1-15. Cabida: 465.92 Metros Cuadrados. Este Apartamento residencial está construido en hormigón reforzado y bloque. Consta de 2 niveles con su puerta de entrada al "Lobby" por el lindero Sur. El área total del Apartamento y sus anejos es de 5,015.19 pies cuadrados equivalentes a 465.92 metros cuadrados, que se distribuyen de la siguiente forma. Área total del Apartamento: En su primer nivel 2,295.12 pies cuadrados. Y en su segundo nivel 1,712.72 pies cuadrados. Para un total de 4,007.84 pie cuadrados. Área de anejos de Storage: 65.85 pies cuadrados. Área total de estacionamiento anejos: 602.96 pies cuadrados.

Área de anejos de la terraza abierta. 338.54 pies cuadrados. Linderos Nivel -Uno (1): por el Sur en 28 pies 8 pulgadas con elemento exterior y en 12 pies 8 pulgadas con el área del lobby, por el NORTE, en 42 pies 2 pulgadas con el exterior; por el OESTE, 67 pies 5 pulgadas con elemento exterior, por el ESTE, en 1 pie 9 pulgadas con elementos exterior, en 16 pies 9 pulgadas con área del lobby y en 32 pies 2 pulgadas con el apartamento 1-16 nivel 1. Linderos Nivel-Dos. por el Sur en 37 pies 4 pulgadas con elemento exterior y en 4 pies 0 pulgadas con el área común, por el NORTE, en 42 pies 2 pulgadas con elemento exterior; por el OESTE, 69 pies 5 pulgadas con elemento exterior, por el ESTE, en 5 pies 10 pulgadas con el apartamento 1-16 nivel - dos (2), en 16 pies 9 pulgadas con área común y en 46 pies 8 pulgadas con el apartamento 1-16 nivel dos (2). Consta en el primer nivel de un vestíbulo, sala, comedor, family room, cocina, medio baño, un "master-bedroom" con sus 2 "walk-in clósets", baño, "master" dividido en un espacio con vanity con dos lavamanos, ducha, jacuzzi, "linen closet" y otro espacio con inodoro y bidet, dos balcones y escaleras que conducen al segundo nivel. Consta en el segundo nivel de un Studio, "Studio Storage", una terraza cubierta, un área de lavandería, un cuarto con su bañera, vanity con lavamanos sencillo e inodoro y walk in closet, closet, baño con bañera, vanity con lavamanos sencillo e inodoro, balcón abierto y terraza abierta. Le corresponde a este Apartamento como anejos, el uso exclusivo de los estacionamientos enumerados E-1, 201, 202, 217, ubicados en el área de estacionamiento y el uso exclusivo del Storage número 1-15 ubicado en el área del lobby de la octava planta del módulo 1, y el uso exclusivo de la terraza abierta ubicada en el nivel 2 del apartamento: todo según ilustrado en el Plot Plan y planos del Condominio aprobados por ARPE. A este apartamento le corresponde una participación de 3.3376 por ciento en los elementos comunes del Condominio.

Inscrita la hipoteca al folio 40 vuelto del tomo 1499, inscripción 3.a, finca 48,933, del Registro de la Propiedad de Guaynabo.

Por su procedencia afecta a servidumbre a favor de la Autoridad de Acueductos y Alcantarillados; servidumbre a favor de la Autoridad de Fuentes Fluviales; servidumbre a favor de la Autoridad de Energía Eléctrica; servidumbre a favor de la Puerto Rico Telephone Company; servidumbre a favor del Estado Libre Asociado de Puerto Rico; servidumbre sobre una faja de terreno de 5 pies de ancho a lo largo de las áreas de condominio para instalación, operación, conservación y reparación de la infraestructura de los sistemas de distribución de telecomunicaciones y de televisión por cable favor de la Junta Reglamentadora de

Telecomunicaciones de Puerto Rico y condiciones restrictivas sobre edificación y uso.

3. La parte demandada incumplió con las cláusulas de la hipoteca antes mencionada por haber dejado de pagar las mensualidades vencidas desde el 1 de enero de 2016, a pesar de los requerimientos de la parte demandante, por lo que la parte demandante declaró la totalidad de la deuda vencida.

4. La parte demandada adeuda a la parte demandante $1,042,623.20 de principal; intereses a razón de 6.125% anual, desde el 1 de diciembre de 2015; más $114,750.00 por concepto de costas, gastos y honorarios de abogado.

5. Las obligaciones que surgen del antes referido pagaré y escritura de hipoteca están vencidas, son líquidas y exigibles.

6. En la escritura de rectificación número 182 se pactó que el inmueble tiene un valor de $1,147,500.00, cuyo valor servirá como oferta mínima en la primera subasta en caso de un procedimiento de ejecución.

7. Conforme la certificación registral provista, el inmueble consta inscrito a nombre de Norfe Group Corporation. Por consiguiente, no resulta de aplicación la Ley 184-2012.[2]

En desacuerdo, el 27 de mayo, los Demandados presentaron el recurso de referencia; formularon los siguientes tres (3) señalamientos de error:

A. Primer Señalamiento de Error:
Erró el Tribunal de Primera Instancia al dictar sentencia sumaria sin considerar adecuadamente la prueba presentada por la parte opositora al remedio, que establece una controversia material sobre el manejo del proceso de mitigación de pérdidas, requisito jurisdiccional en un caso de ejecución de hipoteca.

B. Segundo Señalamiento de Error:
Erró el Tribunal de Primera Instancia al denegar la solicitud de paralización de los procedimientos y dictar sentencia sumaria, aun cuando la parte demandada estableció mediante declaración jurada la necesidad de completar el descubrimiento de prueba sobre el proceso de loss mitigation, conforme a la regla 36.6 de Procedimiento Civil.

C. Tercer Señalamiento de Error:
Erró el Tribunal de Primera Instancia al dictar sentencia sumaria en un caso de ejecución de hipoteca, aun cuando existía una solicitud de loss mitigation pendiente de evaluación, sin permitir un adecuado descubrimiento de prueba, y sin respetar el término que

---

[2] Véase, *Sentencia*, Apéndice 18 del recurso de apelación, págs. 211-212.

establece la Regla 10.1 de Procedimiento Civil para contestar la demanda.

El 20 de junio, el Banco presentó su alegato. En síntesis, sostuvo que, según la propia prueba presentada por los Demandados, no existía una solicitud completa de mitigación de pérdida pendiente, ni al presentarse la Demanda, ni actualmente. Además, arguyó que la Moción del Banco se presentó dentro de los términos de la Regla 36 de las de Procedimiento Civil, *infra*. Resolvemos.

## II.

La sentencia sumaria es un mecanismo procesal que se utiliza para lograr la solución justa, rápida y económica de una controversia donde resulta innecesario celebrar un juicio en su fondo. *Meléndez González v. M. Cuebas, Inc.*, 193 DPR 100, 109 (2015). Este mecanismo procede cuando no existe una controversia real sobre hechos materiales. Un hecho es material cuando puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

La Regla 36.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3, impone un número de requisitos tanto al proponente de la sentencia sumaria como al que se opone a la misma. La moción de sentencia sumaria debe contener: una exposición breve de las alegaciones de las partes, los asuntos litigiosos en controversia, la causa de acción sobre la cual se solicita la sentencia sumaria, una relación concisa y organizada en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia, con indicación de los párrafos o páginas de la prueba documental donde se establecen los mismos, la argumentación del derecho aplicable y el remedio que se solicita. 32 LPRA Ap. V, R. 36.3(a).

De igual forma, la parte que se opone a la sentencia sumaria tiene que cumplir con las exigencias de la Regla 36. En particular, debe enumerar aquellos hechos materiales de buena fe controvertidos y aquellos sobre los cuales no hay controversia. En ambos casos, por cada hecho, se tienen que indicar los párrafos o páginas de la prueba documental que establecen o impugnan ese hecho. 32 LPRA Ap. V, R. 36.3(b). Así pues, la parte que se opone a que se dicte sentencia sumariamente "no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente". 32 LPRA Ap. V, R. 36.3(c). Los hechos enumerados en la moción de sentencia sumaria que no sean debidamente controvertidos podrán considerarse admitidos. 32 LPRA Ap. V, R. 36.3(d). De forma similar, "[e]l tribunal no tendrá la obligación de considerar aquellos hechos que no han sido específicamente enumerados". *Íd.*

Claro está, cuando un tribunal evalúa y analiza una moción de sentencia sumaria, no está obligado a resolverla apoyado únicamente en los documentos que se presentan con la moción, sino que se deben considerar todos los documentos en los autos en los que surja alguna admisión hecha por alguna de las partes. *Const. José Carro v. Mun. Dorado,* 186 DPR 113, 130 (2912). De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso, deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al.,* 132 DPR 115, 133 (1992). (Citas en el original suprimidas).

Además, la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática. *Mun. de Añasco v. ASES et al.,* 188 DPR 307, 327 (2013); *Córdova Dexter v.*

*Sucn. Ferraiuoli*, 182 DPR 541, 556 (2011); *González Aristud v. Hosp. Pavía*, 168 DPR 127, 138 (2006).  Solo procede que un tribunal dicte sentencia sumariamente cuando, de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y otra evidencia, no surja controversia real sustancial sobre algún hecho material y, además, proceda como cuestión de derecho.  32 LPRA Ap. V, R. 36.3(e).  Es decir, "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia".  *Meléndez González*, 193 DPR a las págs. 109-110, citando a *Const. José Carro v. Mun. Dorado*, 186 DPR a la pág. 129 y a *Nieves Díaz v. González Massas*, 178 DPR 820, 868 (2010).

## III.

De entrada, destacamos que el proceso de mitigación de pérdidas, tanto bajo la Ley Núm. 169-2016, como bajo el Reglamento X[3] de la RESPA, aplica solamente a viviendas principales.  En específico, la Sección 1024.30(c)(2) del Reglamento X expresamente indica que los procedimientos comprendidos desde la Sección 1024.39 hasta la Sección 1024.41 (sobre *loss mitigation*) únicamente aplican a préstamos hipotecarios que garanticen una propiedad que sea la residencia principal del deudor.[4]  De igual modo, la Exposición de Motivos de la Ley 169-2016, *ante*, establece que el proceso para evaluar una solicitud de mitigación de pérdidas estará reglamentado y regido por los términos del Reglamento X.  Por

---

[3] Regulation X, 12 CFR Part 1024.
[4] §1024.30 Scope
[…]
(c) Scope of certain sections
(1) […]
(2) The procedures set forth in §§ 1024.39 through 1024.41 of this subpart **only apply to a mortgage loan that is secured by a property that is a borrower's principal residence**.  (Énfasis suplido).

ende, no aplica a inmuebles que no la sean residencia principal de un deudor hipotecario.[5]

En este caso, no surge claramente del récord si la Propiedad es la residencia principal del Deudor.[6] Sin embargo, el Deudor no ha alegado en momento alguno que la Propiedad sea su vivienda principal y la misma está a nombre de la Corporación. Si en efecto no se trata de la vivienda principal del Deudor, no aplicarían en este caso ni el Reglamento X ni la Ley 169-2016, *supra.* De todas maneras, no es necesario resolver este asunto porque, aun bajo la premisa de que dichas disposiciones aplican al caso, no tiene razón el Deudor. Veamos.

Del récord surgen de forma incontrovertida los hechos que sustentan la reclamación del Banco. De hecho, los Demandados únicamente impugnan lo relacionado con el "manejo del proceso de mitigación de pérdidas" y con el momento en que se presentó la Moción del Banco. En cuanto al primer asunto, en esencia, plantean

---

[5] Evidencia de ello consta expresamente en las definiciones que provee el Artículo 2 del referido estatuto:

a. Acreedor Hipotecario — cualquier persona natural o jurídica, ya sea una entidad prestataria o financiera, un banco o una cooperativa, debidamente autorizada por las leyes de Puerto Rico o las leyes de los Estados Unidos de América para **conceder, o que conceda, préstamos con garantía hipotecaria sobre una residencia o vivienda principal**. También se considerará un acreedor hipotecario el **tenedor o portador de un pagaré que contenga un gravamen inmobiliario sobre una residencia o vivienda principal en Puerto Rico**. Igualmente, para propósitos de esta Ley, "acreedor hipotecario" incluirá aquellas entidades encargadas de administrar y dar servicios a los acreedores hipotecarios **relacionados con préstamo con garantía hipotecaria sobre una residencia o vivienda principal** (en inglés servicer).

b. Deudor Hipotecario — **Persona natural que ha incurrido en un préstamo de consumo o para propósitos personales garantizado con un gravamen hipotecario sobre su residencia o vivienda principal.** Esta definición incluirá a **todas las personas naturales** que sean contractualmente responsables de la obligación que se intenta hacer efectiva en el procedimiento de cobro o de ejecución de hipoteca.

c. Residencia o Vivienda Principal — Aquella que se utiliza como el **hogar principal del deudor o del deudor y su familia inmediata**, y que para fines contributivos sobre bienes inmuebles es aquella para la cual aplicaría la exención contributiva principal. (Énfasis y subrayado provisto).
[...]
2 LPRA sec. 2892.

[6] Véase, por un lado, *Oposición a Desestimación* de 7 de agosto de 2024, Entrada [19], pág. 2 de 4 y *Moción Informativa y Solicitando de (sic) Orden*, Entrada [27], pág. 1 2, del Sistema Unificado de Manejo y Administración de Casos (SUMAC TPI); y, por otro lado, *Solicitud de Anotación de Rebeldía y Sentencia Sumaria*, Apéndice 6 del recurso de apelación, pág. 90; *Moción Solicitando Sentencia Sumaria*, Apéndice 12 del recurso de apelación, pág. 162.

que, al presentarse la Demanda, había pendiente una solicitud al respecto. No tienen razón; veamos.

Del récord surge que el Banco le comunicó al Deudor, por escrito, que su solicitud estaba incompleta y que, de interesar acogerse a una opción de *loss mitigation*, debía "presentar una solicitud completa de mitigación de pérdidas para ser evaluado para todas las opciones … disponibles para usted". Véase, por ejemplo, comunicación escrita de 17 de abril de 2020 dirigida a los Demandados.[7]

También, consta en el récord evidencia incontrovertida de los intentos del Banco de comunicarse por teléfono y por escrito con el Deudor. En conexión, el Banco acompañó la *Dúplica a Réplica* instada el 26 de agosto de 2024, con un detalle de las llamadas y cartas de cobro que el Banco gestionó y que demuestran que los Demandados nunca completaron una solicitud de mitigación de pérdidas.[8]

Además, el Banco acompañó su oposición a la Moción de Desestimación con copia de varias cartas enviadas a los Demandados, algunas mediante correo certificado con acuse de recibo, mediante las cuales se le ofrecieron varias oportunidades a los Demandados de llegar a un acuerdo que evitase un litigio. Por ejemplo, la carta con fecha de 25 de marzo de 2024[9] expresamente le indica al Deudor que aún podría tener alternativas para retener la Propiedad y mencionó varias de esas alternativas: moratorias, planes de pago y modificación. También se le informó al Deudor que había alternativas de disposición: venta pre-ejecución o entrega voluntaria. Resaltamos que se le indicó que, para ser evaluado para

---

[7] Véase, *Dúplica Conjunta a Réplica…*, Apéndice 16 del recurso de apelaciones, pág. 202.

[8] Véase, *Dúplica a Réplica*, Entrada [23] de SUMAC TPI, Anejo 1 *Loan Activity All Activity*, 01/01/2020- 08/01/2020; Anejo 2 LM Tracking History, Anejo 3 Notes and Memos.

[9] Véase, *Oposición a Moción de Desestimación*, Entrada [19] de SUMAC TPI, Anejo 1, pág. 2 de 14 y pág. 5 de 14.

dichas alternativas, debía proporcionar información sobre las circunstancias que le impidieron hacer pagos de la hipoteca al Departamento de Mitigación de Pérdidas.

Por su parte, mediante una carta con fecha de 13 de noviembre de 2023,[10] el Banco, además de informar el atraso en pagos de la hipoteca, nuevamente exhortó a los Demandados a comunicarse con la Unidad de Mitigación de Pérdidas para conocer las opciones disponibles y solicitar una evaluación. Añadió una descripción breve de cada una de las alternativas disponibles de retención y de disposición del inmueble. Además, detalló los programas de ayuda gratuita aprobadas por el Departamento de Vivienda y Desarrollo Urbano (HUD, por sus siglas en inglés).

Por otro lado, y contrario a lo que arguyen los apelantes, la Moción del Banco fue presentada dentro del término aplicable. Mediante una *Orden* notificada el 2 de octubre de 2024, el TPI denegó la solicitud de anotación de rebeldía del Banco y estableció que el término para contestar la Demanda vencía el 15 de octubre de 2024.[11] Por su parte, la Moción del Banco se presentó el 24 de febrero de 2025. Adviértase que la Regla 36.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1 taxativamente dispone que se puede presentar una solicitud de sentencia sumaria "en cualquier momento después de haber transcurrido veinte (20) días a partir de la fecha en que se emplaza a la parte demandada...". De todas maneras, aun si se hubiese presentado a destiempo, ello no conllevaría la revocación de la Sentencia, pues no se ha planteado que devolver el asunto al TPI, para que el Banco presente

---

[10] Véase, Oposición a Moción de Desestimación, Entrada [19], Anejo 5, pág. 1 de 4.
[11] Véase, *Orden*, Apéndice 7 del recurso de apelación, pág. 102. Resaltamos que pesar de que los Demandados instaron un recurso de *certiorari* (KLCE202401117) para revisar la denegatoria de la solicitud de reconsideración, es harto conocido que un recurso de *certiorari* ante esta curia no paraliza los trámites judiciales ante el TPI.

nuevamente su moción de sentencia sumaria, podría arrojar un resultado distinto.

En fin, el Banco sustentó adecuadamente su reclamación. Aunque los Demandados plantearon que había una solicitud pendiente de mitigación de pérdidas, la realidad es que, al presentarse la Demanda, no estaba pendiente una solicitud completa de mitigación de pérdidas, ello porque, en abril de 2020, la solicitud a la cual hace referencia el Deudor, se había notificado por el Banco como incompleta. Tampoco se demostró que el TPI hubiese incurrido en algún error de derecho ni abusado de su discreción en el manejo del caso.

IV.

Por los fundamentos anteriormente expuestos, se confirma la *Sentencia* apelada.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones